Gerdes v. State.

---

JOHN GERDES v. STATE OF NEBRASKA.

FILED DECEMBER 15, 1919.    No. 21114.

1. **Criminal Law: BURDEN OF PROOF.** The burden of proof in a criminal prosecution is upon the state, and if the evidence fails to establish any essential element of the crime, charged, the defendant must be acquitted.

2. **Sedition: ELEMENTS OF CRIME.** In a prosecution under chapter 5, Laws 1918 (Extraordinary Session), the essential element of the offense is the intent to obstruct the government in the prosecution of the war. Words spoken in anger in a quarrel will not justify a conviction, unless there is evidence from the circumstances or the connection in which they were used, or otherwise, that the defendant realized that the effect might be to so obstruct the government, and that he intended that effect.

3. ———: **INTENT: EVIDENCE.** The evidence indicated in the opinion does not prove such intent.

ERROR to the district court for Gage county: LEANDER M. PEMBERTON, JUDGE. *Reversed.*

*S. D. Killen,* for plaintiff in error.

*Clarence A. Davis, Attorney General, George W. Ayres* and *J. B. Barnes, contra.*

SEDGWICK, J.

The defendant was prosecuted under the act of 1918, commonly known as the "Sedition Act;" Laws 1918,

ch. 5. It was enacted with an emergency clause and took effect on the 9th day of April, 1918. Four days later the circumstances occurred upon which this prosecution is based. The act provides: "If any person with intent to obstruct, hinder, delay, discourage, hamper, or otherwise interfere with the efficient prosecution of the war in which the government of the United States is now engaged, shall," etc. Then follow thirteen specifications of acts which, if done with the intent specified, should constitute the crime of sedition. The penalty prescribed is a fine "in any sum not to exceed ten thousand dollars, or be imprisoned in the county jail or in the state penitentiary for any period not to exceed twenty years." The information contained eight counts, and the defendant was found guilty upon three counts, and sentenced to pay a fine of $1,000 and the costs of the prosecution. The first count of the information upon which the defendant was found guilty charges the defendant did "speak the following words and statements:    *    *    * 'The Government is in with the grocers and millers to rob the poor men.' 'The flour that we have now would not make bread that a —— hog would eat.' 'The farmer that raises his own wheat has a right to grind it up and eat as much as he —— pleases.'" And the fourth count, on which he was also found guilty, charged substantially the same words. The fifth count charges that, referring to the county committee, the defendant said "the following words in substance: 'I don't give a —— what you tell that committee; you can tell them to go to ——.'"

There is such a conflict in the evidence as to the language used by the defendant that, without further discussion, it may be said that it presented a question for the determination of the jury. The vital question in the case is whether these words were spoken by the defendant "with intent to obstruct, hinder, delay, discourage, hamper, or otherwise interfere with the efficient prosecution of the war in which the government of the

United States'' was engaged. If the defendant used the language ascribed to him, did he intend thereby ''to obstruct, hinder, delay, discourage, hamper, or otherwise interfere with the efficient prosecution of the war?'' ''Burden of proving that offense has been committed rests upon the government; and if the evidence fails to establish any essential element of the crime charged, the defendant must be acquitted. * * * Suppose a case where all the testimony comes from the side of the prosecution: The defendant has a right to say that upon the proof so introduced no case is made against him, because there is left in doubt one of the essential elements of the offense charged, namely, the wrongful, unjustifiable, unlawful intent.'' *Commonwealth v. McKie,* 61 Am. Dec. 410 (1 Gray [Mass.] 61). Undoubtedly the intent can be proved by circumstances. If such language had been used at a public meeting called for the purpose of discouraging enlistment in the army, or the purchase of these bonds, or some other or all of the purposes of the government in the prosecution of the war, and it appeared that the speaker was in sympathy with the objects of the meeting, these facts, together with the circumstances and connection in which the words were used, might justify a finding of criminal intent.

The defendant is a man past 65 years of age. He was a native of Holland; born in that part of Holland which was near to the territory afterwards appropriated by Germany, and there is nothing in the record proving or even indicating that he sympathized with Germany in the war in which we were engaged. When he was 13 years old his father brought him to this country, where he has since resided, having become a citizen of this country. He was an industrious man, and had accumulated some property, and raised a family. He purchased liberty bonds in the amount of $1,650. Two of his sons were in the service, and the defendant was encouraging another son to enlist. In April, 1918, it appears the people of Gage county, as in other parts of our country,

were very much in earnest in assisting in the prosecution of the war, and, at the time in question, were especially earnest in securing subscriptions to the Government's Liberty Loan. The committee who had this in charge had made a list of those they thought ought to buy the bonds, stating the amount that each one ought to buy. It seems that they fixed this defendant's quota at $650. The defendant at the time was in very embarrassing circumstances. He was without ready money, and his immediate resources consisted of real estate upon which he could not procure an advancement for the purpose of buying these bonds, because of the fact that his wife was insane and not competent to execute with him the necessary securities. The patriotism and enthusiasm of the people prompted them to discuss with a good deal of earnestness the failure of any one, whose quota had been determined, to comply therewith in full, and it seems that they had discussed this defendant's failure to comply with this assessment at the club at which one McCann was present. Mr. McCann, coming from the club, met Mr. Gerdes, and an altercation occurred between them in regard to the matter, from which it appears that very severe language was used by both parties, and on the same evening Mr. DeBolt and Mr. Kees, two of the subscription committee, went to Mr. Gerdes' house. It is charged that in the controversies which ensued there the defendant used the language stated in the information. They showed the defendant a written notice stating the amount of bonds he was required to purchase. The defendant told them his financial situation, and said that as soon as he could dispose of some corn he expected to buy liberty bonds. They insisted that he borrow money and take his quota of bonds. He declined to do that, and a most violent controversy ensued.

A witness who was sitting on the porch of a house near-by testified that he saw the committee hand defendant a paper and then go with defendant into his house. He could see them in the house through a large bay

Gerdes v. State.

window. He saw defendant "sitting there in his rocking chair," and could hear Mr. DeBolt's voice in "a very loud tone." He was questioned, and made answers as follows: "Q. Did you see any motion made there by Mr. Kees? A. Yes, sir. Q. What was that motion? A. Mr. Kees got up and apparently shook his fist at Mr. Gerdes. He had a paper in his hands. Q. Could you tell whether he was mad? A. It appeared very much that way." None of the parties present could tell exactly what any one said, together with the connection in which it was said, and the reply it called forth. Improper things were undoubtedly said in anger, and it is possible that some of the things said and done by each of these three combatants might have operated to obstruct the work of the government, but it is impossible that the members of this committee were aware that there might be such a result from their part in this dispute, or that they intended that there should be. There is nothing to indicate that any one would have supposed that anything the defendant said to these two enthusiastic committeemen was intended by him to obstruct the government in any way, much less that such was in fact the purpose and intent of the defendant in quarreling with the committee in regard to his duty under the circumstances to immediately comply with their assessment. Both parties used violent language, and the facts in evidence and the circumstances of their quarrel all indicate that the defendant was recklessly repelling the imputation of his disloyalty, which was being urged against him because he refused to allow others to dictate how much he would invest in bonds, and when he should purchase them, and how provide the money for that purpose, rather than any intent on his part to obstruct the government in prosecuting the war.

The judgment of the district court is reversed and the cause remanded.

REVERSED.

Cornish and Dean, JJ., concurring.

No doubt the committee were actuated by patriotic motives in their transaction with defendant, and it is possible that his language towards them might have been more or less discouraging to them in the prosecution of their work. The case turns on whether he intended to interfere with the efficient prosecution of the war. Here was a man who at the time had two sons in the war and who, the evidence shows, had given financial aid to it. We cannot believe that he wished a German victory. If he did not, he wished the war prosecuted. No amount of malice on his part towards the committee as individuals establishes guilt. He was provoked. He was a Hollander. The presumption would be that he stood for his adopted country. Filial affection and sense of duty would prompt patriotic motives. It is a regrettable circumstance that he was asked if he would not give money for the release of his sons from the army. When asked this question, he promptly answered that he would not. The inquiry had in it a suggestion of disloyalty. It would not be surprising that a man, easily irritated, but with a sense of pride, might at such a time utter words of anger. The *animus* of his language was apparently directed against the personnel of those whom he addressed and not at all against the government.

Rose, J., dissenting.

I dissent from the ruling of the majority that the evidence is insufficient to sustain defendant's conviction for sedition.

The law of Nebraska declares that if any person, with intent to interfere with the efficient prosecution of the war, shall discourage the lawful raising of funds for the national defense, he shall be deemed guilty of sedition. In the information it is charged in specific terms that defendant, while in conversation with two members of the authorized Beatrice Committee lawfully engaged in soliciting funds for the national defense, applied to that committee vile and profane epithets and sent them word

Gerdes v. State.

to "go to hell." There is abundant proof of the truth of this charge as made. There is direct and positive evidence that defendant referred to the committee in the shocking terms described in the information and sent to them the impudent and insulting message of defiance mentioned. The intent to interfere with the efficient prosecution of the war and the discouraging of the committee in lawfully raising funds for the national defense are fair deductions from the conduct and the language of defendant as shown by the evidence. He is chargeable with the intent implied by his acts and words and the jury are the judges of his motives where the evidence is sufficient to establish guilt. If the committee entrusted with the raising of funds for the national defense were subjected to profanity and defiance in the performance of their duties, they would naturally be discouraged within the meaning of the sedition law. With citizens generally assuming the attitude of defendant, who would serve on such a committee? "The lawful raising of funds for the national defense" is what defendant was forbidden to discourage. For the purpose of a conviction under the sedition law the committee were not held to a higher standard of etiquette or ethics than the "lawful raising of funds." The testimony fully justifies the finding of the jury that the work of the committee conformed to the statutory standard. On the record presented, in view of the verdict of the jury and the sentence of the trial court, the conduct of the committee is not open to criticism, and the guilt of defendant as charged in that part of the information accusing him of discouraging the lawful raising of funds for the national defense is established beyond a reasonable doubt.

MORRISSEY, C. J., and LETTON, J., concur in this dissent.